UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
_____

| | |
|---|---|
| FLIGHT OPTIONS, LLC and<br>FLEXJET, LLC,<br><br>    Plaintiffs and Counter-Defendants,<br><br>v.<br><br>INTERNATIONAL BROTHERHOOD OF<br>TEAMSTERS, LOCAL 1108; INTERNATIONAL<br>BROTHERHOOD OF TEAMSTERS; and<br>BROTHERHOOD OF<br>TEAMSTERS, AIRLINE DIVISION,<br><br>    Defendants and Counter-Plaintiffs. | No. 1:16-CV-00732<br><br>Order & Order<br>[Resolving Doc. 47] |

_____

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On April 22, 2016, Counter-Plaintiffs International Brotherhood of Teamsters, et al. ("Pilots Union" or "the Union") filed a motion for a preliminary injunction and temporary restraining order against Counter-Defendants Flight Options, et al. ("Carriers").[1] The lawsuit stems from pilot integration issues and collective bargaining issues after a merger between airline carriers Flight Options and Flexjets.

On May 25, 2016, this Court granted the preliminary injunction.[2] The Court ordered Carriers to accept the integrated seniority list, rescind the voluntary separation package, and bargain in good faith with the Union Counter-Plaintiffs.[3]

On October 24, 2016, Counter-Plaintiffs Pilots Union filed a motion to find Counter-Defendants Carriers in contempt. The Pilots Union argues that the Carriers violated the preliminary injunction. Pilots Union also moved for further temporary and preliminary injunctive

---

[1] Doc. 10. Counter-Defendants opposed. Doc. 13. Counter-Plaintiffs replied Doc. 18.
[2] Doc. 33.
[3] *Id*. at 17. On June 8, 2016, Carriers filed an appeal from this Court's order to the Sixth Circuit Court of Appeals. Doc. 40. Counter-Defendants' appeal is now pending before the Sixth Circuit.

relief.[4] The Union argues that the Carriers have violated the preliminary injunction by failing to rescind the voluntary separation package and by failing to negotiate collective bargaining issues in good faith.[5] The Union requests further injunctive relief (1) requiring Carriers to bargain and (2) preventing Carriers from transferring certain aircraft abroad to one of their subsidiaries.[6]

For the following reasons, the Court **GRANTS in part** and **DENIES in part** Counterclaim-Plaintiffs Pilots Union's motion for contempt and **GRANTS in part and DENIES in part** Pilots Union's motion for further injunctive relief.

## I. Factual Background

This case concerns disputes between Pilots Union and Carriers arising out of the merger of two luxury jet airline carriers: Flexjet and Flight Options. This Court's May 25, 2016 preliminary injunction order sought to temporarily resolve some of those disputes. The Pilots Union now argues that Carriers should be found in contempt for violating that order. The Pilots Union also claims that it should receive further injunctive relief.

### A. Contempt

On April 22, 2016, the Pilots Union filed a motion for preliminary injunction and temporary restraining order against the Carriers.[7] Important for this decision, the Pilots Union argued that although the Pilots Union was the certified pilot representative, the Carriers improperly presented Pilot Union members with a voluntary separation package ("VSP") without notice to the Union or bargaining opportunity. The VSP sought to resolve overstaffing issues after the merger.[8] Pilots Union said that Carriers were required to bargain with the Union over

---

[4] Doc. 47. Brief in Support, Doc. 47-1. Carriers responded to the contempt argument, Doc. 54, and the request for further injunctive relief, Doc. 55. Pilots Union replied. Doc. 57. Carriers filed a surreply. Doc. 58-1.
[5] Doc. 47 at 1-2.
[66] *Id*.
[7] Doc. 10. Counter-Defendants opposed. Doc. 13. Counter-Plaintiffs replied Doc. 18.
[8] *See* Doc. 33 at 14-17.

Case No.16-CV-732
Gwin, J.

such a package, refused to do so, and presented the VSP to the pilots without abiding by Railway Labor Act ("RLA") procedures.[9]

On May 25, 2016, this Court granted the Pilots Union's preliminary injunction.[10] The Court ordered Carriers to rescind the VSP and ordered the Carriers to bargain with the Union.[11]

After this Court's order, the Carriers rescinded the VSP and notified all pilots that the offer had been withdrawn.[12] Carriers did not, however, rescind the VSP for pilots that had accepted the VSP, had resigned, and were in the process of receiving benefits before the preliminary injunction was issued.[13]

As for a new VSP, Pilots Union and Carriers met face-to-face on May 31 and June 1, 2016.[14] The parties exchanged proposals.  The Union argues that the parties reached a binding agreement.[15] Pilots Union alleges that the agreement fell through, however, because the Carriers conditioned the agreement on the Union's subsequent proposal for dropping this lawsuit.[16] The Carriers respond that they complied with the Court's order by bargaining in good faith with Pilots Union, but were unable to reach a final agreement.[17]

### B. Further Injunctive Relief

#### 1. Negotiation

Both before and after the Court's May 25 order, the Pilots Union has attempted to negotiate rates of pay, work rules, and other issues for the new combined class of Flight Options

---

[9] *Id*.
[10] *Id*.
[11] *Id*. at 17. The Court also ordered Carriers to accept Pilots Union's integrated seniority list, *id.*, which is not disputed here.
[12] Doc. 54 at 2-3.Carriers state that some pilots had already resigned under the VSP. *Id*. Carriers did not understand the Court's order to require Carriers to somehow reverse those pilots' resignations. *Id*.
[13] *Id*. at 3.
[14] Doc. 47-1 at 7.
[15] *Id*.
[16] *Id*.
[17] Doc. 54 at 4.

3

Case No.16-CV-732
Gwin, J.

and Flexjet pilots.[18] The Union states that Carriers are "going through the motions" instead of engaging in any meaningful bargaining.[19]

Carriers argue that this issue comes down to a disagreement between the parties on the appropriate scope of bargaining. Specifically, Carriers argue that there is a distinction between 2010 Collective Bargaining Agreement ("CBA") Section 1.5(c)(4) bargaining and RLA Section 6 bargaining.[20] The 2010 CBA is the collective bargaining agreement between Flight Options and the Union, originally agreed to in March 2010. The 2010 CBA still controls today. [21]

According to Carriers, the parties disagree over whether current points of negotiation, including pay for the post-merger pilot class, fall under Section 1.5(c)(4). Carriers argue that Section 1.5(c)(4) issues should take priority over RLA Section 6 disputes.

The Union disagrees, arguing that Carriers must bargain over Section 6 issues now but refuse to do so.[22]

To summarize, the parties' 2010 CBA Section 1.5(c)(4) sets up a procedure to bring the new pilots from the acquired airline under the 2010 CBA contract provisions. If they are unable to reach a negotiated agreement for incorporating pilots from the acquired airline, Section 1.5(c)(4) requires the parties submit unresolved issues to binding interest arbitration. Importantly, Section 1.5(c)(4) is broad and requires mediation, and interest arbitration, of nearly all CBA provisions.

### 2. Aircraft Transfer

In late June and early July 2016, the parties participated in an arbitration under the 2010 CBA § 1.5(c)(2) to resolve fence issues regarding working terms during the pendency of

---

[18] Doc. 47-1 at 7.
[19] *Id*.
[20] Doc. 55 at 2.
[21] *See infra* at 11-12.
[22] *See, e.g.*, Doc. 47-1.

4

Case No.16-CV-732
Gwin, J.

negotiations.[23] The arbitrator's Section 1.5(c)(4) Fence Agreement Decision requires that only Flight Options pilots can fly "Flight Options Aircrafts," and orders that such aircrafts "not be sold, leased or transferred in any fashion to FlexjetLLC or One Sky Flight, LLC, or any subsidiaries to avoid or evade the terms" of the Fence Agreement Decision.[24]

In August 2016, Flexjet announced that Flexjet Ltd., Flexjet's U.K. subsidiary, would acquire a company called FlairJet.[25] Flexjet also announced that FlairJet would utilize Flight Options Aircrafts.[26]

The Union contends that the Carriers' plan to transfer aircrafts from the United States to Europe violates the Fence Agreement Decision. Arbitration on this plane transfer issue was scheduled for January 16-17, 2017.[27] The Union argues that it needs injunctive relief because aircraft transfers to the U.K. before the arbitrator's decision could defeat this Court's jurisdiction to order their return.[28]

### C. Procedural History

On October 24, 2016, Pilots Union filed a motion for contempt and further temporary and preliminary injunctive relief.[29] The Pilots Union argue that the Carriers should be found in contempt for failing to rescind the VSP. The Union also seeks a finding that the Carriers failed to negotiate a new agreement in good faith.[30] The Union argues that the Carriers reached

---

[23] Doc. 47-1 at 9.
[24] *Id*. at 10 (citing 47-3 at Ex. 17). The Flight Options Aircrafts that cannot be transferred include 23 "Nextent 400XTi" jets. *Id*.
[25] Doc. 47-1 at 11.
[26] *Id*. at 11-12. Specifically, Flexjet announced that "[b]y the end of the year," Flexjet will "start introducing the first Nextant 400XTis" to Flairjet. *Id*. at 11-12 (citing 47-3 at Ex. 19). The Pilots Union argues that these aircraft are Flight Options Aircrafts under the Fence Agreement and therefore cannot be transferred.
[27] Doc. 58-1 at 7; Tr. at 47:22-48:1.
[28] Doc. 47-1 at 13; Tr. at 49:14-50:22 Because neither the arbitrator nor this Court would have personal jurisdiction over the U.K. subsidiary to order return of the aircrafts, Pilots Union argues it would be without relief.
[29] Doc. 47. Brief in Support, Doc. 47-1.
[30] Doc. 47 at 1-2.

5

Case No.16-CV-732
Gwin, J.

agreement on the VSP and should be required to execute and implement the negotiated June 2016 VSP agreement.[31]

The Union also requests further injunctive relief 1) ordering Carriers to negotiate mandatory bargaining subjects for the new combined class of Flight Options and Flexjet pilots under RLA Section 6 and 2) preventing the Carriers from transferring certain aircraft to their British subsidiaries and requiring Carriers to proceed to arbitration.[32]

The Court held a hearing on January 12, 2017.

## II.    Legal Authority

### A. Contempt

In considering a motion for civil contempt, the moving party must show "by clear and convincing evidence" that the opposing party violated the district court's prior order.[33] The prior order must be "definite and specific" so that the party charged with violating the order is aware of its requirements.[34] Any "ambiguities must be resolved in favor" of the non-movant.[35]

### B. Injunctive Relief

A district court's decision to grant a preliminary injunction under the Railway Labor Act is discretionary.[36] In considering whether to use a preliminary injunction, courts weigh: "(1) whether the movant has demonstrated a substantial likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without the injunction; (3) would the

---

[31] Doc. 47-1 at 13.
[32] *Id*. at 14-15.
[33] *Paterek v. Vill. of Armada, Michigan*, 801 F.3d 630, 643 (6th Cir. 2015) (citing *Glover v. Johnson*, 75 F.3d 264, 267 (6th Cir. 1996)).
[34] *Id*. at 643 (citing *United States v. Conces*, 507 F.3d 1028, 1042 (6th Cir. 2007)).
[35] *Id*.
[36] *Adams v. Fed. Express Corp.*, 547 F.2d 319, 322 (6th Cir. 1976) (internal citations omitted).

6

Case No.16-CV-732
Gwin, J.

preliminary injunction cause substantial harm to others; and (4) will the public interest be served if the injunction issues."[37]

However, in a RLA labor dispute, a district court may "enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury."[38]

The Railway Labor Act provides,

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.[39]

The RLA distinguishes between two categories of labor disputes: "disputes concerning the making of collective agreements," known as major disputes, and "disputes over grievances," known as minor disputes.[40] Federal courts have jurisdiction to deal with major disputes; minor disputes must be submitted to binding arbitration.

The Sixth Circuit recently described the difference between major and minor disputes. The Sixth Circuit said that a major dispute is one that arises "where a CBA does not exist or where one of the parties seeks to change the terms of an existing CBA. The issue in a major dispute 'is not whether an existing agreement controls the controversy,'" as it is in a minor dispute.[41] In other words, a minor dispute "concerns a grievance about either 'the meaning or proper application of a particular provision with reference to a specific situation.'"[42]

---

[37] *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).
[38] *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 303 (1989).
[39] 45 U.S.C. § 152.
[40] *Elgin, J. & E. Ry. Co. v. Burley,* 325 U.S. 711, 722 (1945).
[41] *Wheeling & Lake Erie Ry. Co. v. Bhd. of Locomotive Engineers & Trainmen*, 789 F.3d 681, 690 (6th Cir. 2015) (quoting *Burley,* 325 U.S. at 725).
[42] *Id*. (quoting *Burley,* 325 U.S. at 723).

7

Case No.16-CV-732
Gwin, J.

This case presents a combination of major disputes and minor disputes. The parties operate under a collective bargaining agreement that gives the Flexjet pilots certain rights under the 2010 CBA. But Section 1.5(c)(4) of that agreement also provides for negotiation and arbitration of forward-reaching contract provisions that establish new Flexjet pilot contract rights.

### III.    Analysis

**A. Carriers violated the Court's May 25, 2016 order.**

Counter-Defendant Carriers violated the Court's preliminary injunction order by failing to memorialize a VSP agreement the Carriers had reached with the Pilots Union.

As a preliminary matter, the Carriers violated the Court's May 25, 2016 order by failing to rescind the VSP for pilots that had previously accepted the VSP and resigned. In that order, the Court found that "[o]ffering voluntary separation packages to Flight Options pilots without any meaningful bargaining with Pilots Union violates the status quo."[43] Before offering the package, "Carriers were required to meet, confer and negotiate with the pilot certified representative before offering the separation proposal."[44]

The Court's order is sufficiently specific. Carriers should have known that they were required to rescind the VSP both going forward and also for pilots that had already accepted the VSP.

Although the Carriers violated the Court's order to rescind the VSP for all pilots, this does not seem to make a difference. At the January 12, 2017 hearing, the Union recognized the logistical difficulties the Carriers, Union, and retired pilots would face if the Carriers rescind the

---

[43] Doc. 33 at 15.
[44] *Id*. at 16.

8

Case No.16-CV-732
Gwin, J.

retired pilots' VSP agreements.[45] The Union then withdrew any request for a remedy regarding pilots who had already accepted the VSP before this Court's order finding the Carriers were required to revoke the offer.[46]

Because this issue is moot, the Court **DENIES** the Union's motion to find Carriers in contempt for failing to rescind the VSP as to the retired pilots.

Relief is appropriate, however, for Carriers' failure to execute the VSP separation package that the parties had agreed upon.[47]

Between May 31 and June 1, 2016, the parties exchanged proposals and had agreed upon a new separation package.[48] After negotiations, Union representatives First Officer Laddie Hosatlek and Captain Efrem Vojta and Company representative Robert Sullivan agreed upon separation language.[49]

At the January 12, 2017 hearing, the parties submitted opposing accounts as to whether the handshake that consummated VSP negotiations on June 1, 2016 reflected a final agreement. Carriers argue that the handshake was a good faith gesture after two days of bargaining, but argue that issues were still outstanding such that a final agreement was not reached.[50]

---

[45] Tr. 169:4-22.
[46] *Id*.
[47] Pilots Union's exhibits suggest that two separation packages were negotiated, one for Flight Options and one for Flexjet. Doc. 47-3 at 3. The Court's referral to a "separation package" addresses all separation package negotiations.
[48] Doc. 47-1 at 7; Doc. 54 at 4.
[49] Hostalek testified:

> A. That is the document that Bob Sullivan at the same time he shook my hand I told him we needed to be a memorandum of understanding with regard to the VSP for the Flexjet pilots. He hemmed and hawed a little, and I said Bob, it's fine. It's no different than the Flexjet -- Flight Options agreement, it's everything you want, but it's got to be a memorandum of understanding: And I said I need you to also initial the comment for the release on the Flight Options letter of agreement. I said, and counsel is going to just work out that release. And he hesitated a little, and then he said, okay, we have an agreement, and we shook a second time, and then he shook Captain Vojta's hand, the president of the local.

[50] Tr. 180:9-17. OneSky Flight, LLC Chief Administrative Officer Robert Sullivan testified that after "heated discussions" and "strong headway towards an agreement," he shook the hands of Union representatives. Sullivan stated that four issues were still outstanding, including the Flexjet memorandum of understanding, the Flight

9

Case No.16-CV-732
Gwin, J.

The Union gives evidence that a final agreement was reached,[51] and Carrier representative Sullivan "threw his hand out to shake [Union representatives Hosatlek and Vojta's hands] and said 'we've got an agreement.'"[52]

The next day, on June 2, 2016, Carriers sent the Union a draft agreement under which the Union would dismiss any VSP-related counterclaims with prejudice.[53] Carriers contend that dismissal of the VSP portion of Pilots Union's lawsuit was negotiated as part of the agreement.[54] Pilots Union argues that it was mentioned during negotiations, but was considered insignificant and would be resolved by the lawyers later.[55]

On June 3, 2016, Pilots Union responded with their own draft. While the Union agreed to dismiss VSP-related counterclaims with prejudice, the Union also made a new proposal.[56] The Pilots Union made the new proposal that Carriers would not appeal this Court's preliminary injunction and that the preliminary injunction would be converted to a permanent injunction.[57]

The Court finds that an agreement was reached on June 1, 2016. The agreement does not, however, include the Union's subsequent demands to transform the preliminary injunction into a permanent one or for Carriers to withdraw their appeal.

Testimony supports the Court's conclusion that an agreement was reached. At the January 12 hearing, witnesses testified that at the end of the June 1, 2016 negotiations, the parties

---

Options letter of agreement, an individual release and separation, and the specific language as to dismissal of the VSP portion of this lawsuit. *Id*.

[51] Tr. 57:11-19. First Officer Laddie Hostalek testified that the parties agreed to each substantive provision by marking them with "TOK," signifying acceptance of the proposal. *See also* Doc. 47-3 at 31-33.

[52] Tr. 57:7-59:4. Hostalek testified that at the time of the handshake, he discussed with Robert Sullivan that counsel would work out various details and technicalities. *Id*. Hostalek testified that Sullivan agreed, said they had an agreement, and shook his and Captain Vojta's hands a second time. *Id*. at 59:4-60:23. Captain Frederick Dubinsky testified that he did not witness the handshake but that a final deal was reached, and subsequent to the handshake, Carrier representatives told him "absolutely, we have a deal." Tr. 146:21-147:22.

[53] Doc. 47-3 at 41-48.

[54] Tr. at 181:18-19.

[55] Tr. 55:10-56:25.

[56] *Id*. at 55.

[57] *Id*.

10

Case No.16-CV-732
Gwin, J.

reached an agreement on all substantive aspects of a voluntary separation program.[58] The handshake between Carriers representative Sullivan and Union representatives Hostalek and Vojta consummated the deal.  Good faith bargaining requires that the parties memorialize their "handshake agreement" in a final written agreement.[59]

During negotiations, the parties agreed that with the VSP agreement, the Union would drop the VSP portion of this lawsuit.[60] Carriers' subsequent written request[61] that the Union dismiss VSP-related claims was integral to the VSP settlement and must be included in the final written agreement. Pilots Union's subsequent proposal to dismiss Carriers' appeal, however, were not inferable from the VSP settlement.  Demanding that the Carriers accept the May 25 injunction as permanent and withdraw any appeal of the injunction was not agreed to.[62]

Therefore, the Court **GRANTS** Pilots Union's motion and finds that Carriers failed to bargain in good faith by failing to execute documentation of the voluntary separation program agreement. The parties are ordered to finalize an agreement. Said agreement includes the Union dropping the VSP-related portion of this lawsuit, but neither bars Carriers from appealing this Court's May 25 order nor transforms this Court's May 25 injunction into a permanent injunction.

## B.  Pilots Union is entitled to further injunctive relief.

Pilots Union requests further injunctive relief (1) ordering Carriers to engage in Section 6 bargaining, and (2) preventing Carriers from transferring certain aircraft to one of their

---

[58] Tr. at 181:18-19.
[58] Tr. 55:10-56:25; 57:7-59:4; 59:4-60:23; 146:21-147:22; 180:9-17; Doc. 47-3 at 31-33.
[59] *Cf. Chicago & N. W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 574 (1971) (stating that good faith bargaining in RLA Section 6 disputes requires "management and labor 'to exert every reasonable effort to make and maintain agreements'").
[60] Tr. 55:10-56:25.
[61] Doc. 47-3 at 41-48.
[62] For example, this Court's May 25 injunction required Carriers to accept Pilots Union's proposed integrated seniority list—a separate requirement from the VSP rescindment and negotiations.  Carriers' appealed the entire preliminary injunction. Pilots Union had no right to demand that Carriers withdraw their appeal to reach an agreement on a new VSP when the appeal concerns other issues.

Case No.16-CV-732
Gwin, J.

subsidiaries and requiring Carriers to proceed to arbitration on the issue.[63]

### 1. Carriers are ordered to bargain over RLA Section 6 issues.

The Union argues that Carriers must engage in RLA Section 6 bargaining. Before addressing the Union's argument, the Court first outlines the contractual framework operating on the post-merger pilots class and Carriers.[64]

The 2010 CBA between the Union and Flight Options[65] has a five-year lifespan[66] and formally expired in March 2015.[67] After formal expiration, however, the 2010 CBA "shall renew itself without change thereafter, unless written notice by either party of intended change is served in accordance with Section 6, Title II, of the Railway Labor Act."[68]

In other words, the 2010 CBA continues to operate until a new Section 6 proposal is made and Railway Labor Act procedures are complied with. On February 24, 2016, the Union sent Carriers notice of a new proposal.[69] The 2010 CBA remains in effect, however, until a new Section 6 agreement can be reached.

Section 1.2(a), the 2010 CBA's scope provision, states:

> "all present and future revenue flying performed in and for the service of the Company, *its Affiliates*, or the Company's Parent . . . shall be performed . . . *in accordance with the terms and conditions of this Agreement* and any other applicable agreement between the Company and the International Brotherhood of Teamsters, Airline Division."[70]

---

[63] Doc. 47-1 at 29, 32.
[64] The Court acknowledges that much of the following analysis deals with interpreting the 2010 CBA, a minor dispute over which the arbitrator has jurisdiction. However, the Court finds it helpful to explain its understanding of the operative contractual framework before addressing the difference between Section 1.5(c)(4) and RLA Section 6 negotiations.
[65] Doc. 8-2 at 340-341. Flight Options and the Union agreed to the 2010 CBA on March 31, 2010, more than three years before Flight Options and Flexjet merged. Doc. 1 at 8.
[66] Doc. 8-2 at 223 ("The parties agree that this Agreement may continue in full force and effect for five years as described in this Section 30."). The CBA's continual operation depended on Carriers' option to renew the CBA over that five-year period. *Id*. The parties agree that the CBA operated throughout the five-year period.
[67] *See id*.; Doc. 1 at 8.
[68] Doc. 8-2 at 223-224.
[69] *See, e.g.*, Doc. 47-1 at 25.
[70] Doc. 8-2 at 7-8 (emphasis added).

12

Case No.16-CV-732
Gwin, J.

Flexjet is a Flight Options "Affiliate."[71] Therefore, the 2010 CBA applies not only to Flight Options pilots, but also to Flexjet pilots. While a new Section 6 agreement is being negotiated, the 2010 CBA governs Carriers' relationship with the post-merger class of both Flight Options and Flexjet pilots.[72]

Despite the 2010 CBA's application to both Flight Options and Flexjet pilots, the integration of the two pilot groups and the application of the 2010 CBA to the Flexjet pilots raises issues. This scenario triggers 2010 CBA Section 1.5(c)(4).

Under Section 1.5(c)(4) of the 2010 CBA, "If Pilots of the acquired carrier [in this case, Flexjet pilots] are hired by the Company [Flight Options], *the Agreement shall be modified in those respects necessary to permit the integration* through negotiations between the surviving air carrier and the representative of the consolidated, post-merger Pilot craft or class. *If a modified agreement is not executed within nine months* from the date a final and binding integrated Pilot Seniority List is issued, the *parties shall submit outstanding issues to binding interest arbitration*."[73]

Different from Section 1.5(c)(4) bargaining, RLA Section 6 bargaining is triggered when a contract party proposes substantial changes to the operating CBA. Section 1.54(c)(4) and RLA Section 6 bargaining have different negotiation processes.[74]

---

[71] The Union agrees that Flexjet is an affiliate. Tr. 8:20-10:4. Carriers do not seem to dispute this particular point.
[72] Carriers dispute that the 2010 CBA applies to the Flexjet pilots. Tr. 10:13-18:6. Carriers argue that Section 1.5(c)(4) establishes that the Flexjet pilots are not "folded in" to the 2010 CBA—if that were the case, Carriers argue Section 1.5(c)(4) would not exist. *Id*. at 17:13-24. Carriers also argue that the Fence Agreement shows that Flight Options and Flexjet pilots are to be kept separate pending merger, not folded in together under the 2010 CBA. *Id*. at 40:2-46:10 (citing Doc. 8-2 at 14-15; Doc. 55-4 at 5.).
[73] Doc. 8-2 at 15 (emphasis added).
[74] *Wheeling & Lake Erie Ry. Co. v. Bhd. of Locomotive Engineers & Trainmen*, 789 F.3d 681, 690–91 (6th Cir. 2015); *see also* Doc. 55 at 2-3 ("[N]egotiations under Section 1.5(c)(4) of the CBA end in either agreement or interest arbitration, while Section 6 negotiations proceed through the RLA process of direct negotiations, mediation, then potential release to self-help.").

13

Case No.16-CV-732
Gwin, J.

The parties disagree over which disputed issues are "necessary" to permit integration under Section 1.5(c)(4).[75] The Carriers argue that the Section 1.5(c)(4) "necessary" category is limited. The Carriers follows this by saying that other issues are Section 6 disputes that should be deferred until the Section 1.5(c)(4) issues are completed.[76]

In contrast, the Union argues that Section 1.5(c)(4) issues are broad and include almost all issues that could be addressed in RLA Section 6 negotiations.[77] In other words, all disputed issues between the parties, some of which deal with traditional Section 6 issues like rates of pay, must be resolved to permit integration.[78]

These divergent positions result in Pilots Union's argument that Carriers have been surface bargaining, essentially ignoring the Union's Section 6 proposals. The Union therefore moves the Court for further injunctive relief ordering Carriers to bargain in good faith.

It appears obvious that the Section 1.5(c)(4) scope needs to be broad. 2010 CBA Section 1.2(a) makes the 2010 CBA provisions apply to Flexjet wages, hours, vacation, discipline, and other terms for the Flexjet pilots. But because the formerly non-union Flexjet pilots previously had no controlling collective bargaining agreement, they operated under significantly different work conditions than the Flight Option pilots. To bring the Flexjet pilots under the 2010 CBA, and to merge the two previously separate pilot groups, will require negotiation or interest arbitration of almost all working conditions.

The parties agree that the arbitrator's Section 1.5(c)(4) jurisdiction gives the arbitrator power to decide which issues are "necessary" to integrate the Flexjet pilots into the 2010 CBA

---

[75] *Compare* Doc. 61 *with* Doc. 62.
[76] *See, e.g.*, Doc. 62. Carriers argue that the nine-month deadline in Section 1.5(c)(4) makes those issues more pressing, giving Carriers the right to prioritize them over broader Section 6 disputes.
[77] Doc. 61 at 1.
[78] *Id*.

14

Case No.16-CV-732
Gwin, J.

provisions, and to resolve that set of issues on the merits.[79] The Court agrees that it lacks jurisdiction over these issues and does not address them.[80]

No matter which issues the arbitrator deems "necessary" to permit integration of the pilots, however, it is likely that there will be substantial overlap between that set of issues and the broader Section 6 disputes. Thus, it is almost inevitable that the parties' Section 6 disputes will be addressed during Section 1.5(c)(4) negotiations and arbitration.[81]

Regardless, Carriers have a distinct duty to immediately engage in good faith bargaining under RLA Section 6.[82] Carriers cannot avoid Section 6 bargaining simply because they want to prioritize the arguably narrower category of Section 1.5(c)(4) issues.

Therefore, the Court **GRANTS** Pilots Union's motion for injunctive relief and orders Carriers to bargain with the Union in good faith regarding the Union's Section 6 proposals now. The Court reiterates that Section 6 bargaining and Section 1.5(c)(4) arbitration may overlap. A new CBA may be reached, however, outside the parameters of arbitration.

In ordering the Carriers to engage in Section 6 negotiations, the Court understands that only limited meeting dates and arbitration dates are available on the parties' calendars. The Court expects the parties reasonably apportion Section 1.5(c)(4) sessions and Section 6 sessions.

---

[79] *See, e.g.*, Tr. 25:16-20; Doc. 55 at 3 n.3.
[80] The Court does not have jurisdiction to interpret the 2010 CBA, a minor dispute. *Elgin*, 325 U.S. at 722.
[81] For example, the Carriers' integrated collective bargaining agreement ("ICBA") proposals—meant to focus on 1.5(c)(4) issues only—covered with the same 30 issues included in Pilots Union's Section 6 proposals. The Court finds it difficult to distinguish between the two.
[82] Once one party makes a new RLA Section 6 proposal after the old CBA has expired, the normal RLA bargaining process begins. *See Wheeling*, 789 F.3d at 690–91. The Union triggered this process on February 2016. Doc. 47-1 at 30. Carriers agree that the old CBA is "open generally for negotiations." Doc. 55 at 2. RLA Section 6 bargaining requires private negotiations, mediation under the National Mediation Board, and then potentially arbitration (that the parties can voluntarily accept or reject). *Id*. The dispute could then be presented to the President to prevent a strike. *Id*.

15

Case No.16-CV-732
Gwin, J.

### 2. The Union's request for injunctive relief preventing aircraft transfers is premature.

Initially, the Union also requested injunctive relief "preserving arbitration" over the potential transfer of Flight Options Aircrafts to Flexjet's U.K. subsidiary FlairJet. The parties agree that the arbitrator will decide whether aircraft transfers are permissible under the parties' Fence Agreement.[83]

That arbitration was scheduled for January 16-17, 2017.[84] Carriers agreed not to transfer any aircraft before that hearing.[85] The arbitrator promised a decision by January 25, 2017.[86] Thus, the Court does not anticipate a violation of the status quo without the arbitrator's decision, making an injunction from this Court unnecessary. Furthermore, at the January 12, 2017 hearing, Pilots Union agreed that it is pointless to now address this issue.[87]

Even if Carriers transfer the aircraft before the arbitrator issues a decision, Pilots Union would not suffer irreparable injury. For example, if Carriers transfer aircraft to the U.K. and the arbitrator later decides transfer was improper, the Union can petition this Court for relief.

Pilots Union expressed concern that the Court lacks jurisdiction to order return of the aircraft once they are in the U.K.[88] Even if that were the case, this Court has jurisdiction over Flexjet, LLC.[89] Flexjet LLC is the parent company of Flexjet Ltd., a U.K. subsidiary.[90] Flexjet Ltd. has acquired FlairJet.[91] Hypothetically, FlairJet will utilize the relevant aircraft.[92]

---

[83] Interpreting the fence agreement is a minor dispute, *see Wheeling*, 789 F.3d at 69 (quoting *Burley*, 325 U.S. at 725).
[84] Doc. 58-1 at 7; Tr. at 47:22-48:1.
[85] Carriers would not agree to an open-ended agreement not to transfer any aircraft until the arbitrator makes his decision on the merits. Tr. at 47:22-49:2. Carriers argue that a decision may take a long time to issue, and that the Union does not suffer irreparable harm. *Id*.
[86] Tr. at 47:22-48:1.
[87] Tr. at 51:15-23.
[88] Tr. at 49:14-50:22.
[89] Flexjet's principal place of business is within the Northern District of Ohio. Doc. 1 at 3.
[90] Doc. 47-1 at 11.
[91] *Id*.
[92] *Id*.

16

Case No.16-CV-732
Gwin, J.

At minimum, the Court can hold Flexjet, LLC's management in contempt of court for FlairJet's failure to comply with any arbitration decision requiring the return of any aircraft removed after the arbitration decision. The Pilots Union would not be without remedy.

Accordingly, the Court **DENIES without prejudice** Pilots Union's request for injunctive relief regarding aircraft transfers.

### IV. Conclusion

For the reasons above, the Court **GRANTS in part** and **DENIES in part** Counterclaim-Plaintiffs Pilots Union's motion for contempt and **GRANTS in part** and **DENIES in part** Pilots Union's motion for further injunctive relief.

IT IS SO ORDERED.

Dated: January 24, 2017            *s/      James S. Gwin*
                                   JAMES S. GWIN
                                   UNITED STATES DISTRICT JUDGE